UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| **RYAN WILLIAMS et al.**,<br><br>Plaintiffs,<br><br>vs.<br><br>**CITY OF DETROIT et al.**,<br><br>Defendants. | 2:19-CV-12600-TGB<br><br>**ORDER GRANTING DEFENDANT OLYMPIA ENTERTAINMENT'S MOTION TO DISMISS (ECF NO. 12)** |

In 2008, Plaintiffs Tracie Hannah, Cheryl Robinson, and Ryan Williams began operating as street vendors along Woodward Avenue in Detroit, Michigan. When construction on the Little Caesar's Arena ("LCA") began in 2015, Plaintiffs were told by the City of Detroit that their licenses would not be renewed during construction and once LCA was fully operational. Plaintiffs brought the instant lawsuit against the City of Detroit, the Business and Licensing Department for the City of Detroit, the Building Safety Engineering and Environmental Department for the City of Detroit, and Olympia Entertainment, Inc. ("Olympia")—the alleged operator of LCA. Before the Court is Defendant

1

Olympia's motion to dismiss. ECF No. 12. For the reasons stated herein, the Court will **GRANT** Defendant Olympia's motion.

## I. Background

Plaintiffs are licensed street vendors who operated on the corners running from Henry and Woodward to Sibley and Woodward in Detroit, Michigan from early 2008 to 2017. ECF No. 5, PageID.17. Plaintiffs allege that in 2016-2017 they were informed[1] that their vendor licenses would not be renewed due to the construction of the LCA. *Id.* Plaintiffs claim they were told the licenses would not be renewed because they were operating within 300 feet of the arena, because it was an unsafe area, and because the relevant sidewalks would be closed to the public. *Id.* at PageID.17-18. Plaintiffs claim that once the LCA opened on September 5, 2017, these reasons were revealed to be false and misleading and that in fact the sidewalk was accessible, open, and used by the public. *Id.*

A few days after the arena opened, Plaintiffs allege that Williams attended a weekly Detroit City Council meeting and expressed their concerns about the City's decision not to renew the vendor licenses. *Id.* He explained that the sidewalk was still open and that the Building Safety and Engineering Department should not have denied the licenses. *Id.* Plaintiffs allege that shortly after Williams voiced these concerns, Olympia "closed the public sidewalk and installed barriers that prevented the Vendors from servicing the Woodward street area in

---

[1] It does not specify by whom, but it is presumed by the City of Detroit.

effect[,] retroactively giving cover to the false claim made by the Building Safety and Engineering Department regarding the closure of the sidewalk." *Id.* at PageID.18.

Plaintiffs then brought the instant lawsuit against the City of Detroit, the Business and Licensing Department for the City of Detroit, and the Building Safety Engineering and Environmental Department for the City of Detroit alleging that the City's denial of their vendor licenses violated their rights to equal protection and due process under the Fifth and Fourteenth Amendments of the United States Constitution. ECF No. 1. One month later, Plaintiffs filed an amended complaint, adding Olympia, and alleging the same constitutional claims. ECF No. 5. Olympia now moves to dismiss the complaint arguing that Olympia is not a state actor and thus cannot be liable for constitutional violations. ECF No. 12. Alternatively, Olympia argues that Plaintiffs have not plausibly alleged any wrongdoing by Olympia. *Id.*

## II. Standard of Review

When deciding a motion to dismiss under Rule 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations,"

3

but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008).

## III. Discussion

### A. Whether Olympia is a state actor

To bring constitutional claims under 42 U.S.C. § 1983,[2] a plaintiff must plead sufficient facts to show that (1) the defendant is a state actor—i.e., it acted under color of state law, and (2) that the plaintiff was deprived of a right secured by the Constitution. When a plaintiff brings constitutional claims against a private actor like Olympia under § 1983, the private actor will be considered a state actor "only if their conduct that allegedly gave rise to the deprivation of the [plaintiff's] constitutional rights may be 'fairly attributable to the State.'" *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)). The Sixth Circuit

---

[2] While Plaintiffs bring their claims directly under the Constitution, these claims must be brought under 42 U.S.C. § 1983. *See Majeske v. Bay City Bd. of Educ.*, 177 F. Supp. 2d 666, 670-71 (E.D. Mich. 2001). Therefore, the Court will construe Plaintiffs' complaint as bringing § 1983 claims.

4

employs four tests to determine whether alleged conduct can be fairly attributed to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test. *Id.* (citing *Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 127 (6th Cir. 2009)).

As an initial matter, Plaintiffs rely on the Supreme Court's decision in *Burton v. Wilmington Parking Authority* for the assertion that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." 365 U.S. 715, 722 (1961). They claim that based on this language, Plaintiffs' allegations are sufficient to survive a motion to dismiss.[3] But this language does not relieve a plaintiff of her burden of alleging sufficient factual material that, if accepted as true, states a claim to relief that is plausible on its face. *Ashcroft*, 556 U.S. at 678. Plaintiffs also rely on the facts of *Burton*. That case involved an African American man who alleged he was denied service at a restaurant because of his race. 365 U.S. at 716. The relevant question before the Court was whether the restaurant's actions were deemed state action, given that the restaurant leased the space from a government entity; the restaurant sat at the bottom of a parking structure that was dedicated to "public uses" in performance of the Wilmington Parking Authority's function of

---

[3] Plaintiffs actually rely on this quote from *Burton* to support their argument on three of the four state actor tests.

creating adequate parking facilities for the community. *Id.* at 723-24. The space was leased to the restaurant to garner more funds for the Authority, and while "the commercially leased areas were not surplus state property," they "constituted a physically and financially integral and, indeed indispensable part of the State's plan to operate it's project as a self-sustaining unit." 365 U.S. at 724. Guests of the restaurant could park in the Authority's parking structure, and the Authority paid for all upkeep and maintenance in the restaurant. *Id.* The restaurant was also permitted to take advantage of the Authority's tax exemptions if it made improvements to the space. *Id.* The Court reasoned that this was sufficient evidence of "joint participa[tion] in the challenged activity," such that it could not be considered to have been so "purely private" as to fall outside of the scope of the Fourteenth Amendment. *Id.* at 725 ("By its inaction, the Authority, and through in the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination.").

Plaintiffs contend that Olympia is "similarly situated" to the restaurant, alleging that Olympia is tax exempted and "kept up by public funds." ECF No. 15, PageID.86-87.[4] They argue that when Olympia

---

[4] Plaintiffs' brief also suggests that the City of Detroit prevented women and minorities from conducting business on Woodward Avenue and that this amounted to some kind of race or gender-based discrimination. ECF No. 15, PageID.87. But the amended complaint does not contain any allegations of race or gender-based discrimination by any Defendant. ECF No. 5.

6

"unjustifiably" closed the sidewalk and erected a barrier in aid of the City, the City—like the Authority in *Burton*—jointly participated in Olympia's wrongful conduct. *Id.* But Plaintiffs' reliance on *Burton* is misplaced. First, *Burton* was distinctly limited to its facts; the Court expressly stated that it was "defining the limits of [its] inquiry," and held "that when a State leases property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself." 365 U.S. at 726. There are no allegations in Plaintiffs' amended complaint that the City of Detroit owns the Little Caesars arena and rents it to Olympia. *See generally* ECF No. 5.

Second, the Supreme Court has narrowed the scope of its holding in *Burton* in a number of subsequent cases. For example, in *American Manufacturers Mutual Insurance Co. v. Sullivan*, the Court explained that *Burton* was one of its early cases on state action under the Fourteenth Amendment and that "later cases have refined the vague 'joint participation' test embodied in that case." 526 U.S. 40, 57 (1999). Citing two other Supreme Court decisions— *Blum v. Yaretsky*, 457 U.S. 991 (1982), and *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)—the *American Manufacturers* court explained that "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not

7

fall within the ambit of *Burton*." 526 U.S. at 57 (quoting *Blum*, 457 U.S. at 1011). Indeed, in *American Manufacturers*, the Court held that private workers' compensation insurers' decisions to withhold payment for disputed medical treatments pending a "utilization review" pursuant to Pennsylvania law could not be attributed to Pennsylvania as state action. 526 U.S. at 51. This was true even though Pennsylvania's decision to allow insurers to withhold payment could be seen as encouraging them to withhold payment. *Id.* In sum, *Burton* is not nearly so analogous to the instant case as Plaintiffs allege. The Court will next consider each of the four tests to determine whether Olympia's alleged conduct can fairly be attributed to the City of Detroit.

### 1. Public Function Test

To show that Olympia was a state actor under the public functions test, Plaintiffs must show that Olympia "exercise[s] powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). This is considered a "relatively stiff test," and "few areas are deemed exclusive state action." *Marie*, 771 F.3d at 632. *See also Marsh v. Alabama*, 326 U.S. 501 (1946) (company town); *Evans v. Newton*, 382 U.S. 296 (1966) (municipal park). "[A]nd many other actions—even those that involve extensive government regulation—do not suffice to establish

8

state action (e.g., insurance, education, workers' compensation, or electrical utilities)." *Marie*, 771 F.3d at 632-33.

Here, Plaintiffs argue in their response to Olympia's motion to dismiss that Olympia's conduct is akin to the exclusively public function of exercising eminent domain. ECF No. 15, PageID.87-89. Under the "Takings Clause" of the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. That clause is made applicable to the States by the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1987). Therefore, the State may use its eminent domain power to take private property for public use, so long as just compensation is provided. *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005). And the state may use its eminent domain power to transfer property from one private party to another if the purpose of the taking is future use by the public. *Id.* But Plaintiffs' amended complaint has not alleged sufficient facts to demonstrate activity that in any way approximates eminent domain. As an initial matter, Plaintiffs' amended complaint references Olympia as an individual defendant only once, in paragraph 19:

> Within days after Plaintiff [Williams] communicated to the Detroit City Council regarding the discrepancy, Olympia Entertainment then closed the public sidewalk and installed barriers that prevented the Vendors from servicing the Woodward street area in effect retroactively giving cover to the false claim made by the Building Safety and Engineering Department regarding closure of the sidewalk.

9

ECF No. 15, PageID.19. Therefore, according to Plaintiffs, Olympia improperly closed a public sidewalk and installed barriers to prevent Plaintiffs from operating on Woodward in order to facilitate the City of Detroit's rejection of their permits. This is not an allegation of an exercise of eminent domain without just compensation because there is no allegation that Olympia operating through the City took any *private* property.

Plaintiffs depart from this sole allegation and argue in their response that to effectuate the Detroit City Ordinance prohibiting vendors that operate within 300 feet of a sports arena, Olympia "cooperat[ed]" with the City by helping it measure whether Plaintiffs' vendor operations were within 300 feet of the arena. ECF No. 15, PageID.88. Not only is this an allegation not made in the amended complaint, Plaintiffs do not argue how this action amounts to eminent domain. The only reference to eminent domain in the amended complaint, speaks of the "Defendants" generally, and does not speak to any conduct by Olympia specifically. They allege:

> ¶ 33. Defendants, in denying Plaintiffs' right to renew vendor license[s] intentionally gave Ilitch Holdings Inc. an unfair advantage in the cloud of imminent [sic] domain. ¶ 34. Defendants in protecting Olympia entertainment, unreasonably interfered with Plaintiffs' rights to earn a living in not allowing Plaintiffs to renew their yearly stationary vendors license.

10

ECF No. 5, PageID.21. Plaintiffs' failure to separate out Olympia's conduct here makes it difficult to identify any conduct *by* Olympia, and it is unclear how Olympia could be associated with the allegation in Paragraph 33, as there is no allegation that Olympia played any part in the decision to not renew Plaintiffs' vendor licenses. *See Talison v. City of Detroit*, No. 18-13087, 2019 WL 5265323, at *2 (E.D. Mich. Oct. 17, 2019) (granting defendant's motion to dismiss where the complaint did "not identify any conduct by [the defendant], let alone conduct suggesting that he was personally involved or participated in the alleged unconstitutional actions"). Further, the Complaint fails to explain the connection between Ilitch Holdings Inc. and Olympia Entertainment, which—however obvious that connection may be to a reader who is a Detroiter or a Red Wing fan—is not discernible from the face of the Complaint, and must be explained if the allegation is to make sense in terms of these entities undertaking a public function together. But no explanation is given as to how and whether they were collaborating, or what exactly they did, because this allegation is the only time the company is mentioned.

Plaintiffs also attempt to salvage their argument by raising a variety of questions about the relationship between Olympia and the City of Detroit. ECF No. 15, PageID.88-89. First, these questions are not allegations in the amended complaint that could be used to defend a Rule

11

12(b)(6) motion to dismiss. And second, none of these questions appear to relate to Plaintiffs' argument regarding eminent domain.

Ultimately, Plaintiffs' sole allegation regarding *Olympia's actions* in their amended complaint is that in response to Williams' comments at the Detroit City Council meeting, Olympia improperly closed a public sidewalk and installed barriers to prevent Plaintiffs from operating on Woodward, and that this was done in order to facilitate the City of Detroit's rejection of their permits. Plaintiffs point to no authority stating that a private entity's cooperation in blocking a sidewalk to effectuate the enforcement of a city ordinance amounts to eminent domain. And they would be very unlikely to find such authority if they searched until the end of time, because a municipality's decision to deny a license to a street vendor and a property owner's closing of a public sidewalk to enforce a ensure compliance with a City ordinance is not what eminent domain is. Therefore, Plaintiffs' have failed to meet their burden in alleging that Olympia's conduct passes the public function test.

### 2. State Compulsion Test

"The state compulsion test requires that a State has 'exercised such coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Vistein*, 342 F. App'x at 127-28 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). This level of state compulsion requires "[m]ore than mere approval or acquiescence" by the private party "to hold the

State responsible for those initiatives." *Id.* at 128. And it requires more than an allegation that the private entity cooperated with the state. *Marie*, 771 F.3d at 363. The gist of this theory is that, if the state is effectively forcing a private party to take a certain action, then that private action may be attributed to the state. Plaintiffs contend that Olympia's decision to put a barrier on a public sidewalk is an adequate allegation of "coercion" on the part of the City. ECF No. 15, PageID.90. However, there are no allegations that the City or any of its subdivisions required Olympia to close the sidewalk. Rather, Plaintiffs allege that Olympia closed a sidewalk shortly after Williams confronted the City at a City Council meeting. In reading all of the allegations regarding Olympia in the light most favorable to Plaintiffs, they amount at most to allegations of approval, acquiescence or cooperation with the City in its objective of ensuring no vendors operate within 300 feet of the Little Caesar's arena. And as *Vistein* and *Marie* demonstrate, this level of acquiescence is insufficient under the state compulsion test.

### 3. Symbiotic Relationship or Nexus Test

A similar inquiry to the state compulsion test, under the symbiotic relationship or nexus test, "a private party's conduct constitutes state action where 'there is a sufficiently close nexus between the state *and the challenged action* of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.'" *Marie*, 771 F.3d at 363 (quoting *Wilcher*, 498 F.3d at 520 (citations omitted)) (emphasis added).

13

"[M]ere cooperation simply does not rise to the level of merger required for a finding of state action." *Lansing v. City of Memphis*, 202 F.3d 821, 831 (6th Cir. 2000). *See also Marie*, 771 F.3d at 363. Further, that a private entity receives public funding is not sufficient to establish a close nexus between state and private actors. *Marie*, 771 F.3d at 363.

Here, Plaintiffs argue that their allegation that Olympia's placement of barriers on the Woodward Avenue sidewalk—preventing Plaintiffs from setting up their vendor operations there—demonstrates a nexus between the City of Detroit and Olympia's action.[5] As explained above, at best these are allegations of cooperation, approval or acquiescence with the City's ordinance prohibiting vendors that operate within 300 feet of a sports arena. Even read in the light most favorable to Plaintiffs, this allegation does not suggest the type of symbiotic relationship required of this test. *C.f., Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (finding no sufficiently close nexus between a private school's personnel decisions and the state, where virtually all of the private school's income was derived from government funding). And indeed, here there is no allegation that the City directed or otherwise ordered Olympia to erect the barriers on the sidewalk. Thus, Plaintiffs have not alleged a

---

[5] Plaintiffs also allege that Olympia's involvement of the 300-foot measuring process is also a challenged action with a close nexus to the City of Detroit. ECF No. 15, PageID.91. But again, this allegation is not contained within Plaintiffs' amended complaint and will not be considered.

14

sufficient nexus between the Olympia's decision to erect a barrier and the City of Detroit under this test.

### 4. Entwinement Test

Finally, under the entwinement test, Plaintiffs must allege that Olympia is "entwined with governmental policies" or that the government is "entwined in [the private entity's] management or control." *Marie*, 771 F.3d at 363-64 (quoting *Vistein*, 342 F. App'x at 128). "The crucial inquiry under the entwinement test is whether the 'nominally private character' of the private entity 'is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.'" *Marie*, 771 F.3d at 364 (quoting *Vistein*, 342 F. App'x at 128). Here again, Plaintiffs allegations are not enough. In *Marie*, the Sixth Circuit held that the American Red Cross's assistance with state disaster relief efforts was insufficient under the entwinement test because, at most, it was evidence of "mere cooperation." 771 F.3d at 364 (citing *Lansing*, 771 F.3d at 364). If the Red Cross's disaster relief assistance was insufficient under the entwinement test, then Olympia's erection of a barrier, not alleged to be at the direction or request of the City of Detroit, is likewise insufficient.

In sum, because Plaintiffs have failed to allege sufficient facts to show that Olympia acted under the color of state law, the constitutional claims against it must be dismissed. *Marie*, 771 F.3d at 364.[6]

### IV. Conclusion

Accordingly, Defendant Olympia's Motion to Dismiss (ECF No. 12) is granted. Olympia is **DISMISSED WITH PREJUDICE**. Plaintiffs' claims against the City of Detroit entities remain.

**SO ORDERED**.

Dated: July 30, 2020.

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

---

[6] Olympia also moves to dismiss on the grounds that Plaintiffs' amended complaint fails to plausibly allege any constitutional violation by Olympia. ECF No. 12, PageID.72-75. Because the Court dismisses Olympia with prejudice because the amended complaint fails to allege sufficient facts to show that Olympia acted under the color of state law, it need not reach this issue.